2016 OK CIV APP 78

Jane **BERRYMAN**, Roberta Greenwell, John Wood and Bonnie Cain, Victor Trumbell and Trina Mehojah (Formerly Trina Jankowsi), Appellants,

v.

**OKLAHOMA CORPORATION COMMISSION, Appellee.**

Case Number: 114322

Court of Civil Appeals of Oklahoma, Division No. 2.

Decided: 11/07/2016

Mandate Issued: 12/14/2016

Wes Johnston, JOHNSTON & ASSOCI-ATES, Chickasha, Oklahoma, for Appellants

Robert J. Campbell, Jr., DEPUTY GENERAL COUNSEL, OKLAHOMA CORPORATION COMMISSION, Oklahoma City, Oklahoma, for Appellee

DEBORAH B. BARNES, JUDGE:

¶1 Appellants seek review of a final order of the Oklahoma Corporation Commission (OCC) denying their request for reimbursement from the Petroleum Storage Tank Indemnity Fund (Indemnity Fund). Based on our review, we affirm.

## BACKGROUND

¶2 In January 2013, Appellants filed an application for reimbursement from the Indemnity Fund. Appellants sought payment from the Indemnity Fund in the amount of $750,000 for damages sustained as a result of a petroleum leak (or leaks) as reflected in a judgment rendered in a district court action, following settlement, against the owner of a

gasoline station. Appellants' application was not approved, and Appellants commenced a formal proceeding before the OCC.

¶3 After a hearing conducted before an Administrative Law Judge (ALJ) over the course of nine days in the spring of 2013, the ALJ denied Appellants' application. As stated in the ALJ's report, Appellants "filed an application seeking reimbursement for property and personal injuries sustained as a result of a confirmed release from the site of an old retail gasoline station." Among other alleged damages, damage occurred to the home of one of the Appellants when her home "exploded and burned" in October 2007. This "explosion was later determined to be caused by vapor in a water well where free product was floating on top of the water in the well," and this free product accumulated in the well at least in part due to the well's proximity to an underground petroleum storage tank located at the gasoline station.

¶4 The ALJ denied the application because, among other things, the cap on available funds for the release had already been reached. In addition, the ALJ found unpersuasive Appellants' argument that the cap for a single occurrence does not apply in this case because the damage was the result of at least two occurrences rather than just one.

¶5 After hearing arguments of counsel, and after reviewing the record, the Referee recommended that the report of the ALJ be affirmed, and, in September 2015, the OCC entered its Final Order "find[ing] that the recommendation of the ALJ to deny the relief requested by [Appellants] should be affirmed as recommended by the Referee."

¶6 From the Final Order of the OCC, Appellants appeal.

## STANDARD OF REVIEW

¶7 Regarding the appropriate standard of review this Court must apply on appeal, the Oklahoma Constitution provides as follows:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States [or] the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from.

Okla. Const. art. 9, 20.

¶8 Regarding review of issues of fact and the meaning of "substantial evidence," the Oklahoma Supreme Court has stated:

The [OCC] has a wide discretion in the performance of its statutory duties, and this Court may not substitute its judgment upon disputed factual determinations for that of the [OCC] but is restricted to a determination of substantial evidentiary support for the order issued under authority of the statutes. Searching a record for substantial evidence supporting the order appealed does not entail a comparison of the parties' evidence to determine that which is most convincing but only that the evidence supportive of the order be considered to determine whether it implies a quality of proof inducing a conviction that the evidence furnished a substantial basis of facts from which the issue could be reasonably resolved. Substantial evidence has been additionally outlined as something more than a scintilla; possessing something of substance and of relevant consequence carrying with it a fitness to induce conviction, but remains such that reasonable persons may fairly differ on the point of establishing the case. A determination of substantial evidentiary support does not require weighing the evidence but only a measurement of the supportive points to determine whether the criterion of substantiality is present.

*Sundown Energy, L.P. v. Harding & Shelton, Inc.*, 2010 OK 88, ¶9, 245 P.3d 1226 (citations omitted).

¶ 9 Furthermore, "[i]n cases involving questions of law relating to statutory interpretation, the appropriate standard of review is *de novo*, i.e., a non-deferential, plenary and independent review of the trial court's legal rulings." *Hubbard v. Kaiser-Francis Oil Co.*, 2011 OK 50, ¶ 6, 256 P.3d 69 (internal quotation marks omitted) (citation omitted).

> [G]reat weight is accorded the expertise of an administrative agency. On review, a presumption of validity attaches to the exercise of expertise. An appellate court may not substitute its judgment for that of an agency, particularly in the area of expertise which the agency supervises.
>
> However, an administrative agency order interpreting law is reviewed using a *de novo* standard. It has been noted that an administrative agency's statutory interpretation must be reasonable, and the agency cannot extend its power beyond that granted by statute.

*In re Protest to Certificate of Title Brand Issued to AAAA Wrecker Serv., Inc.*, 2010 OK CIV APP 121, ¶¶ 9–10, 242 P.3d 578 (internal quotation marks omitted) (citations omitted).

## ANALYSIS

### I. The Oklahoma Petroleum Storage Tank Release Indemnity Program

¶ 10 The Oklahoma Legislature created the Petroleum Storage Tank Release Indemnity Program (Indemnity Program) in 1989. *State ex rel. Okla. Corp. Comm'n v. McPherson*, 2010 OK 31, ¶ 2, 232 P.3d 458. The *McPherson* Court explained that, as a general matter,

> [t]he Indemnity Program included the [Indemnity Fund] to pay statutorily specified expenses related to rehabilitating sites polluted by petroleum from petroleum storage tank systems. 17 O.S. 352(5), 353. The [OCC] has jurisdiction over the [Indemnity Fund] and [Indemnity Program]. 17 O.S. 2001 52.

*McPherson*, ¶ 2 (footnotes omitted). A first impression issue presented on this appeal is whether the Indemnity Program authorizes reimbursement for actual physical damages and medical injuries caused by an eligible release, or whether reimbursement for such damages and injuries is limited to those that occur as a result of remediation efforts.

¶ 11 The Indemnity Program provides that "any person entitled to reimbursement pursuant to the provisions of this act shall be reimbursed for certain allowable costs in connection with such corrective action, subject to the conditions specified by this act." 17 O.S. 2011 351(B) (footnote omitted). To be eligible for reimbursement, one must first of all be an "eligible person." The definition of "eligible person" includes, among other things, a "person who is an impacted party[ or] adjacent owner ... who willingly submits to the regulations of the [OCC] governing petroleum storage tank system owners, operators or agents[.]" *Id.* 352(6)(d). An "impacted party" is defined as

> an owner whose property has been impacted by a release from an on-site or off-site petroleum storage tank which the impacted person did not own or operate and for which the impacted person has had no responsibility under Commission rules. An impacted party may apply for an eligibility determination on reimbursement from the [Indemnity Fund]. An impacted party is not subject to the [Indemnity Fund] deductible[.][1]

*Id.* 352(9).[2] In addition, an "eligible release" is defined as "a release for which allowable

---

1. Regarding the deductible which impacted parties are not subject to, "[f]or releases that occurred prior to June 4, 2004," for example, "eligible persons shall pay the five-thousand-dollar deductible as a copayment which may be paid in installments." *Id.* 356(H)(1).

2. We note that Oklahoma Administrative Code 165:27-3-2 (2005) states, in pertinent part, as follows:

   An eligible person can be any of the following who has costs incurred as the result of a confirmed eligible release from a petroleum storage tank system, who has satisfied requirements for PSTD eligibility, and has been issued an Indemnity Fund Eligibility Letter by the PSTD Director.

   . . . .

   (2) An owner whose property has been impacted by a release from an on-site or off-site petroleum storage tank system that was never owned or operated by the property owner and has no responsibility for the release.

   . . . .

costs, as determined by the Administrator, are reimbursable to or on behalf of an eligible person[.]" *Id.* 352(8).

¶ 12 In this case, the ALJ concluded Appellants are "[c]learly ... 'impacted parties' under the statute" in relation to the eligible release from the gasoline station. However, despite statutory language providing for reimbursement for "actual physical damage caused by an eligible release" and for "medical injuries incurred as a result of the eligible release," *id.* 356(I), the ALJ (and the Referee) reached the conclusion that "nothing in the Statutes governing the [Indemnity] Fund authorize[s] the payment of claims for personal injury or property damage *unless those damages occur as a result of remediation efforts.*"[3] The ALJ stated, among other things, that the Indemnity Fund was not "set up to insure or indemnify an individual gas station operator or provide a source of funds to give to parties who have suffered personal injury or property damage as a result of a release,"[4] relying in part on the fact that distributors of fuel, and not retailers, collect the $0.01 per gallon tax which is used to fund the Indemnity Fund.

¶ 13 First of all, however, the Oklahoma Supreme Court has explained that "[t]he 354 assessment of one cent ($0.01) per gallon" is "a direct tax on the ultimate consumer of the fuel," and it is "precollected" by an assessment on the sale by distributors merely for the purpose of convenience. *State ex rel. Wright v. Okla. Corp. Comm'n,* 2007 OK 73, ¶ 19 & n.11, 170 P.3d 1024. We disagree that the ALJ's conclusion in this regard—that the Indemnity Fund can only be used to reimburse for personal injury and property damage caused by the remediation efforts, and not for damage caused by a petroleum spill or leak—is supported by the method of collection of the 354 assessment.

¶ 14 In addition, 350(C) of the Indemnity Program sets forth the Legislature's intent that the Indemnity Fund pay claims in a manner similar to and consistent with the payment of claims by insurance companies:

The Administrator of the [Indemnity Program] shall maintain, operate and administer the [Indemnity Program] *and process, review and pay claims in a manner similar to and consistent with the processing, review and payment of claims by self-insurance pools and insurance companies.*

(Emphasis added.)

¶ 15 More importantly, the Indemnity Program plainly provides that it

*shall cover* corrective action taken and other *actual physical damage caused by an eligible release.* The [Indemnity Fund] *shall also cover any medical injuries incurred as a result of the eligible release* to persons other than employees of the eligible person of the storage tank system or their agents and independent contractors retained to perform any such corrective action.

*Id.* 356(I) (emphasis added.) *See also id.* 353(A) ("The Indemnity Fund shall be administered ... for the benefit of those persons determined to be eligible ... to receive total or partial reimbursement for: ... 3. Payment of claims for *property damage or personal injury resulting from an eligible release*[.]") (emphasis added); *id.* 356(G) ("for the corrective action taken *or the damages or the injuries associated with a release*") (emphasis added).

¶ 16 The ALJ correctly states that "[n]othing in the statutes states or implies that the [Indemnity Fund] is to be used to compensate parties for personal injuries and property damage *as a priority* to remediation efforts."[5] However, the fact that such a priority is not set forth in the statutes does not mean the plain language of the statute—that the Indemnity Fund "shall cover ... actual physical damage caused by an eligible release" and "shall also cover any medical injuries incurred as a result of the eligible release"—is negated. Furthermore, the fact that other parts of the Indemnity Program plainly provide that certain remediation efforts may be reimbursed by the Indemnity Fund does not

---

(4) Adjacent property owner or impacted party.

**3.** (Emphasis added.)

**4.** (Emphasis omitted.)

**5.** (Emphasis added.)

negate the Legislature's intent that physical damage and medical injuries caused by an eligible release also be covered.

¶ 17 The ALJ expresses concern in his report that

> To use the fund to compensate impacted parties for personal injury and property damage as a result of a release would likely consume the allowed funds needed for the remediation, thus leaving pollution in the ground to affect others who would be unable to receive compensation for their personal injury and property damage because they were affected by the same release at a later time. This would result in races to the courthouse to be the first to file their claims for personal injury and property damage to ensure they received compensation to the exclusion of others.

Elsewhere in his report the ALJ stated that "[i]f the funds available were spent paying for personal injuries and/or property damages caused by a release and not in the course of a cleanup, it would clearly impact the Fund's ability to clean up spills."

¶ 18 However, in Oklahoma, the judiciary, as well as the executive branch, lack the power to rewrite a statute merely because the legislation, or a portion of the legislation, does not comport with their concept of prudent public policy. The Oklahoma Constitution provides:

> The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

Okla. Const. art. 4, 1. The Oklahoma Supreme Court has stated:

> In absence of a constitutional defect, we are duty bound to give effect to legislative acts, not to amend, repeal, or circumvent them. We will not exercise authority not vested in this Court by rewriting statutes merely because the legislation does not comport with our concept of prudent public policy.

*Coates v. Fallin*, 2013 OK 108, ¶ 2, 316 P.3d 924 (citations omitted). As even more recently stated by the Oklahoma Supreme Court:

> The nature of this Court's inquiry is limited to constitutional validity, not policy. It is not the place of this Court, *or any court*, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition. A court's function, when the constitutionality of a statute is put at issue, is limited to a determination of the validity or invalidity of the legislative provision and a court's function extends no farther in our system of government.

*Lee v. Bueno*, 2016 OK 97, ¶ 8, 381 P.3d 736 (emphasis added) (citations omitted).

¶ 19 The concerns expressed by the ALJ may be legitimate; indeed, it appears such concerns may be ever more pronounced now that the cap pertinent to this case has not been increased for over ten years.[6] Nevertheless, "[t]he fundamental rule of statutory construction" in this case is to discern the intent of the Oklahoma Legislature, not the intent of the OCC in its rules and regulations,[7] *Cox v. Dawson*, 1996 OK 11, ¶ 5, 911 P.2d 272, and we must refrain from reading exceptions into a statute or imposing requirements not mandated by the Legislature, *Cox v. State ex rel. Okla. Dep't of Human Servs.*, 2004 OK 17, ¶ 26, 87 P.3d 607.[8] We conclude

---

**6.** The cap applicable to this case, "per occurrence," is $1.5 million. The cap was increased by the Legislature from $1 million to $1.5 million by amendment to 356(H)(3)(a) effective November 1, 2005.

**7.** We note that the ALJ's interpretation appears to be consistent with at least some of the pertinent rules and regulations in the Oklahoma Administrative Code. For example, 165:27-1-2 defines "actual physical damage" as "those damages to real and personal property *directly related to corrective action performed* on a release of petroleum from a Commission regulated storage tank system." (Emphasis added.) We further note that 165:27-9-4 provides that "[i]f any part of this Chapter is adjudged by a court of competent jurisdiction to be invalid for any reason or in any manner, the remainder of this Chapter shall not be affected and shall remain in full force and effect."

**8.** "Under our case law, we hesitate to construe any statute that appears clear and unambiguous. Only when the circumstances make it unmistakable that there has been a legislative oversight

reimbursement for actual physical damage and medical injury is not limited to those damages and injuries that occur as a result of remediation efforts, but extends to claims by eligible persons for property damage or personal injury caused by an eligible release.

## II. Additional Issues Presented Regarding Interpretation of the Indemnity Program

¶ 20 In their reports the ALJ and the Referee also appear to imply that those who receive or are eligible for payment from some other state or federal agency or other third-party payor, including an insurance company, are ineligible to receive reimbursement from the Indemnity Fund. While this may be true up to the amount received from the third-party payor or insurance company,[9] the statute in question plainly provides that when such payor "does not fully compensate the eligible person," the eligible person "may seek compensation for the uncompensated amount":

> Except as otherwise provided by the [Indemnity Program], a reimbursement shall not be made to any eligible person who has received or is eligible for payment or reimbursement from any other state or federal agency or other third party payor for the corrective action taken *or the damages or the injuries associated with a release. If a state or federal agency or other third-party payor does not fully compensate the eligible person, then the eligible person may seek compensation for the uncompensated amount from the Indemnity Fund.*

17 O.S. 2011 356(G) (emphasis added).

■ ¶ 21 The ALJ and Referee were also not persuaded that a final judgment and determination of actual damages in a civil action in a state district court could control in a determination of actual damages for purposes of reimbursement from the Indemnity Fund, and they expressed in their reports that actual damages would need to be presented and proven before the Administrator or ALJ regardless of damages determined in a civil action. However, while various limitations are set forth in the statute—for example, the Indemnity Fund is not to be used to, among other things, "[p]ay for punitive damages from any civil action resulting from the eligible release," *id.* 356(I)(3)—the statute noticeably does not contain a limitation for non-punitive damages from a civil action resulting from an eligible release. This is consistent with the fact that "[a]lthough the OCC has the authority of a court of record, it has limited jurisdiction," that "[a]ny action by the OCC must be authorized by statute," that "private rights ... lie within the purview of the district court," and the OCC, "although possessing many of the powers of a court of record, is without the authority to entertain a suit for damages." *Grayhorse Energy, LLC v. Crawley Petroleum Corp.*, 2010 OK CIV APP 145, ¶¶ 10, 12 & 13, 245 P.3d 1249 (citations omitted).[10]

■ ¶ 22 Regardless, the OCC (and Administrator of the Indemnity Fund) does not have discretion to *ex nihilo* deny a claim when confronted with an application from an eligible person who has suffered actual property damage or personal injury as a result of an eligible release and who is not fully compensated by a third-party payor. Instead, 351(B) states that "any person entitled to reimbursement pursuant to the provisions of this act *shall be reimbursed* for certain allowable costs in connection with such corrective action, subject to the conditions specified by

will the Court intervene to clarify statutory enactments." *Dawson*, 1996 OK 11, ¶ 6, 911 P.2d 272. This Court "may not read an exception into a statute not made by the Legislature," *Oglesby v. Liberty Mut. Ins. Co.*, 1992 OK 61, ¶ 13, 832 P.2d 834; that is, "[t]his Court does not read exceptions into a statute nor may we impose requirements not mandated by the Legislature," *Cox v. State ex rel. Okla. Dep't of Human Servs.*, 2004 OK 17, ¶ 26, 87 P.3d 607 (footnotes omitted).

9. The statute also provides that "[t]he right to apply for reimbursement and the receipt of reim-

bursement does not limit the liability of an owner or operator for damages, injuries or the costs incurred as a result of an eligible release." 17 O.S. 2011 356(J).

10. Of course, further inquiry may be necessary where it is difficult or impossible to determine from the judgment roll the actual physical damages and medical injury incurred as a result of an eligible release. This appears to be the stance taken by the Referee in her report.

this act." (Emphasis added) (footnote omitted).

### III. Reimbursement Cap Per Occurrence, and Allegation of Multiple Occurrences

¶ 23 However, as indicated above, a cap of $1.5 million "per occurrence" applies to the circumstances of this case. Indeed, Appellants admit that the amount of funds available for reimbursement in this case, per occurrence, is capped at $1.5 million. *See also* 17 O.S. 2011 356(H)(3) ("Reimbursements shall not exceed ... [$1.5 million] per occurrence[.]"). And Appellants also admit that "[the OCC] has already expended or encumbered all of the funds available ... in reimbursing costs of investigation and remediation activities relating to the pollution associated with the former [gasoline] station."[11] Because the funds available per occurrence in this case is capped at $1.5 million, and because $1.5 million has already been committed by the OCC in this case, Appellants state on appeal that "[t]he existence of multiple releases ... is critically important[.]" Indeed, Appellants asserted below that this case involves two, if not three, occurrences. That is, Appellants sought to prove that a second release occurred at a separate service station located across the road from the gasoline station. Appellants also sought to prove that the gasoline station itself had actually experienced two or more occurrences.

¶ 24 Oklahoma Administrative Code 165:27-1-2 defines "occurrence" as follows:

"**Occurrence**" means the release of a PSTD regulated substance into the soil or groundwater. Each PSTD regulated substance will be treated as one occurrence regardless of the composition of the substance released. Separate occurrences of the same PSTD regulated substance may be allowed if evidence establishes the PSTD regulated substance occurred in two different tank system locations, are separated by time, or both.

"The Legislature may delegate rule making authority to agencies, boards and commissions to facilitate the administration of legislative policy...." *Cox v. State ex rel. Okla. Dept. of Human Servs.*, 2004 OK 17, ¶ 22, 87 P.3d 607 (footnote omitted). As quoted above, "[t]he [OCC] has jurisdiction over the [Indemnity Fund] and [Indemnity] Program." *McPherson*, 2010 OK 31, ¶ 2, 232 P.3d 458. Title 17 O.S. 2011 350(B) provides, in pertinent part, that the OCC

shall maintain, operate and administer the [Indemnity Program] cooperatively with the regulatory program implementing the regulatory responsibilities of the [OCC] pursuant to the Oklahoma Storage Tank Regulation Act or any other division of the [OCC]. Regulatory responsibilities of the [OCC] shall include, but not be limited to, regulatory compliance activities, enforcement of rules promulgated to implement regulatory programs, technical review, development and approval of corrective action plans and determinations that remediation of contaminated sites is complete.

(Footnote omitted.)

¶ 25 "Statutory construction by agencies charged with the law's enforcement is given persuasive effect especially when made shortly after the statute's enactment." *Cox*, 2004 OK 17, ¶ 22, 87 P.3d 607 (footnote omitted). "Once administrative rules are promulgated and successive legislative sessions are convened with no action to reject a rule, the Legislature's silence is regarded as proof of the lawmakers' consent," and "[t]he Legislature is deemed to have adopted an adminis-

---

11. Br.-in-chief at 9. *See also* the order of the ALJ, p. 11 ("[T]he entire amount of funds available has been committed to cleaning up this spill and there are simply no funds to give to [Appellants] to provide the requested relief, thus the requested relief is moot."); Br.-in-chief at 16 ("In this instance, the costs of the investigation ... and the remedial actions ... consumed the entire amount...."). We note that it is perhaps not particularly surprising that all of the funds available have al-

ready been expended or encumbered in this case in which the above-described explosion occurred in 2007, yet Appellants did not file an application for reimbursement from the Indemnity Fund until 2013. The expressed legislative purpose set forth in the Indemnity Program is to avoid "long periods" of delay in the remediation of petroleum spills, leaks and other releases. *See* 17 O.S. 351(A).

trative construction when it amends or re-enacts a relevant statute without overriding the administratively-imposed construction." *Id.* ¶ 24 (footnotes omitted). The Legislature has amended the statute in question without overriding the administratively-imposed construction of the term "occurrence," and we conclude the definition set forth in 165:27-1-2 is not unreasonable or inconsistent with the statute.[12]

¶ 26 In addition,

> Great weight is to be accorded the expertise of an administrative agency, and a presumption of validity attaches to the exercise of expertise when the administrative agency is reviewed by a court. A court should not substitute its own judgment for that of an agency, particularly in the area of expertise which the agency supervises.

*Toxic Waste Impact Grp., Inc. v. Leavitt,* 1988 OK 20, ¶ 12, 755 P.2d 626 (footnote omitted). "It is for the [OCC] to weigh conflicting expert testimony. Because Commission decisions often involve complex issues of ... engineering[ ] and other special knowledge, a presumption of correctness accompanies the [OCC's] findings in matters it frequently adjudicates and in which it possesses expertise." *Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Comm'n,* 2005 OK 47, ¶ 8, 115 P.3d 861 (footnote omitted).

¶ 27 The ALJ stated it was not persuaded by the evidence presented by Appellants in support of their assertion that at least one additional "confirmed release case" should be opened, and the ALJ instead relied upon the evidence and testimony of the OCC technical staff in finding that additional confirmed release cases are unwarranted. As set forth above, the Oklahoma Constitution forbids this Court from substituting its judgment upon disputed factual determinations for that of the OCC, and restricts this Court to a determination of whether the factual determinations of the OCC are supported by substantial evidence. Okla. Const. art. 9, 20; *Sundown Energy,* 2010 OK 88, ¶ 9, 245 P.3d 1226. This determination "does not entail a comparison of the parties' evidence to determine that which is most convincing"; instead, it only entails determining whether the evidence supportive of the order furnishes "a substantial basis of facts from which the issue could be reasonably resolved." *Sundown Energy,* ¶ 9 (citations omitted).

¶ 28 Substantial evidence does exist in support of the OCC's determination that only one occurrence existed in this case. For example, as summarized in the ALJ's report, David Poulsen, who works for the Petroleum Storage Tank Division (PSTD) as an Environmental Analyst, testified that "each PSTD staff member on the review team separately came to the same conclusion[:] no sufficient evidence was present to open a confirmed release case on the [service station] site." Another witness, Salim Douglah, testified "that none of the 6 monitoring wells on the [service station] site showed contamination indicative of a confirmed release[.]" Douglah also testified there was no support "to indicate or substantiate a second occurrence" at the gasoline station.

¶ 29 Appellants point to the fact that three of their witnesses, Joe Foster, a geologist employed by Enercon Services—the environmental consulting firm that conducted the investigation of the gasoline station site—Dr.

---

**12.** It might nevertheless be argued that the definition of "occurrence" set forth in 165:27-1-2 remains vague and in need of further interpretation. In this case, in particular, it might be asked whether a leak extending over a long period of time may constitute more than one occurrence. "Administrative rules, like statutes, are given a sensible construction bearing in mind the evils intended to be avoided." *Cox,* 2004 OK 17, ¶ 22, 87 P.3d 607 (footnote omitted). Regarding leaks, we conclude the only sensible construction of the definition of occurrence set forth in 165:27-1-2 is that two or more leaks occur from the same tank system only if the leaks are "separated by time," as the rule plainly states. Thus, a continuous leak from the same tank system—i.e., a leak not "separated by time" from a preceding or subsequent leak—constitutes only one occurrence even if the leak extends over a period of time. We note that this interpretation is consistent with 17 O.S. 2011 351(A)(2), which reveals the Legislature's intent to treat individual leaks, spills, and other releases of petroleum, as single occurrences: "[s]pills, leaks and other releases of petroleum from ... storage tank systems have occurred, are occurring and will continue to occur[.]" In addition, the alternative of setting an arbitrary marker, such as one day, month or year, such that every day, month or year of a continuous leak constitutes an occurrence, would lead to absurd results.

Robert Knox, and Jerry Black testified that there were multiple releases from the gasoline station site and one release from the service station across the road. However, this argument is unavailing because, on appeal, we are limited to determining whether the OCC's factual determinations are supported by substantial evidence. Appellants also assert the ALJ "completely ignored certain evidence that was unrefuted by the [OCC] staff[.]" However, Appellants, at this point in their argument, do not point to any specific evidence allegedly overlooked by the ALJ, nor will this Court assume from the contents of the summary of the evidence in the ALJ's report that certain evidence was "completely ignored." Clearly, substantial evidence exists in support of the OCC's determination that only one occurrence existed in this case.

### IV. Allegations of Bias and Application of an Unfair Burden of Proof by the ALJ

■ ¶ 30 Appellants argue on appeal that the ALJ failed to function like a judge in a court of record when conducting the adjudicative proceedings, or that he applied an "intolerable and unfair burden on [Appellants]," with regard to the issue of whether a second occurrence should be found to exist and a second confirmed release case opened. Appellants base their argument on the following language contained in the final paragraph of the ALJ's report: "This ALJ is not going to substitute his knowledge concerning whether or not a suspicion of release case should be elevated to a confirmed release case for that of the technical staff. This is the province of the professional Technical staff and their experience and training."

¶ 31 We agree with Appellants that this language, especially when viewed out of context, raises obvious concerns. If the ALJ never questions the opinions of the technical staff of the OCC, then the ALJ is obviously failing in his duty to weigh the evidence and is placing an impossible burden on the appli-

cants, especially in a case like the present one where the applicants presented the testimony of multiple witnesses and experts.[13] However, surrounding the two above-quoted sentences in the final paragraph of the ALJ's report, the following statements are made by the ALJ: that "[t]he evidence furnished to the Court was sufficient to support the Technical Staff's position regarding" whether a second confirmed release case should be opened for the service station site; that "[t]he technical staff explained in great detail their reason for not opening another confirmed release case"; and that the ALJ "was not persuaded by the testimony" of at least one of Appellants' key expert witnesses on this issue.

¶ 32 Furthermore, as stated by the Referee in her report, the PSTD is granted *some* discretion when determining whether to initiate a confirmed release:

> The [OCC's] rules on remediation of petroleum storage tank releases defined "confirmed release" as a "release of petroleum from a regulated storage tank system resulting in levels of chemicals of concern in native soils and/or groundwater that exceed state action levels to which a PSTD case number is assigned and further corrective action is required." OCC–OAC 165:29–1–11. PSTD Staff testified as to the review invested by Staff in the suspicion of release case concerning the ... facility. An initiation of a confirmed release case is discretionary. OCC–OAC 165:25–3–8(c) states that certain "[l]evels of chemical constituent concentrations ... may confirm a release...." See also OCC–OAC 165:29–3–3(b) which states: "[w]hen a confirmed release is confirmed a case may be activated." Both of these rules include permissive language rather than mandatory language. The method is left to the PSTD Staff to determine if a confirmed release case should be opened. The construction and application of laws and rules by the

---

**13.** It has been stated, for example, that "[w]hen the [OCC] acts in an adjudicative capacity it functions much like a court," *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, 1986 OK 16, ¶ 10, 732 P.2d 438, and when the OCC gives an order such as the one appealed, "it acts in its adjudicative capacity rather than its rulemaking

capacity"; thus, "[t]he minimum norms of Federal and State due process must govern review of the Order," *Amoco Prod. Co. v. Corp. Comm'n*, 1986 OK CIV APP 16, ¶ 20, 751 P.2d 203 (approved for publication by the Oklahoma Supreme Court) (footnote omitted).

entity that is responsible for their administration is given deference.[14]

While the PSTD's discretion in this regard is not unlimited—and we make no determination regarding the precise contours of that discretion—the existence of some discretion on the part of the OCC "technical staff" on the issue of whether to open a new confirmed release case[15] must be taken into account when interpreting the complained-of statements.

¶ 33 Reading the complained-of statements in light of the OCC regulations granting the technical staff some degree of discretion, and reading the statements in the context of the additional statements made in the final paragraph of the ALJ's report, we conclude Appellants' argument that the ALJ was biased or applied an "intolerable and unfair burden," and that the Order must, on this basis, be reversed, is unpersuasive.

## CONCLUSION

¶ 34 Although certain statements made in the report of the ALJ in this case are inconsistent with the plain meaning of the controlling statutes, Appellants admit the funds available per occurrence in this case is capped at $1.5 million, and they admit that $1.5 million has already been reimbursed or committed by the OCC. We further conclude that substantial evidence exists in support of the OCC's determination that only one occurrence exists in this case. Finally, we conclude Appellants' argument that the ALJ was biased or applied an "intolerable and unfair burden" is unpersuasive. Consequently, we affirm.

¶ 35 **AFFIRMED.**

THORNBRUGH, P.J., and RAPP, J., concur.

---

**14.** We note that after the Referee's report was issued in July 2015, the OCC regulations were amended effective August 27, 2015, and August 25, 2016.

**15.** The existence of some amount of discretion is consistent with the open-ended definition of "eligible release" set forth in 17 O.S. 352(8): "a release for which allowable costs, as determined by the Administrator, are reimbursable to or on behalf of an eligible person[.]"